WAGSTAFF et al. v. COLLINS et al.

(Circuit Court of Appeals, Eighth Circuit. September 25, 1899.)

No. 1,161.

1. PUBLIC LANDS—LAND ERRONEOUSLY PATENTED UNDER RAILROAD GRANT—ACTS FOR PROTECTION OF PURCHASERS.

Complainants' ancestor made a homestead entry on lands which were within the limits of a railroad grant, but, by reason of existing pre-emption rights thereon, at the time the map of definite location was filed, were excepted from the operation of the grant, although the pre-emption claims

were afterwards abandoned, and, under the construction then given to such grants by the land department, the lands on such abandonment passed thereunder. Yielding to such construction, the homestead settler surrendered possession to the railroad company before the time when he could have proved up under his entry, and the company afterwards sold the lands to defendants, who were bona fide purchasers. The lands were subsequently patented under the grant. *Held*, that the title of the purchasers was confirmed by the act of March 3, 1887 (24 Stat. c. 376), supplemented by the act of March 2, 1896 (29 Stat. c. 39), and that complainants could assert no right to the lands by reason of their ancestor's abandoned entry.

**2.** SAME—RIGHTS OF HOMESTEAD SETTLER BEFORE FINAL PROOF.

A homestead settler on public lands acquires no vested rights therein, as against the United States, prior to the time when, under the law, he becomes entitled to a patent, which deprives congress of the power to vest title to such lands in another.

Appeal from the Circuit Court of the United States for the District of Colorado.

This case was disposed of in the lower court upon demurrer to the amended bill of complaint, the complaint having been adjudged insufficient to warrant any relief. The bill was filed by Daniel R. Wagstaff, Marilla J. Wagstaff, Isabella Wagstaff, Lelah Wagstaff Liebe, Lotta Fern Wagstaff, and Charity J. Goss, the appellants, against Samuel G. Collins, Sewell T. Collins, Michael Spangler, William D. Todd, the Kansas Pacific Railway Company, and the Union Pacific Railway Company, the appellees, and the case thereby made was, in substance, as follows:

The complainants below and the appellants here are the heirs at law of James Wagstaff, who died intestate in the month of January, 1880. On December 26, 1871, the deceased applied to the register and receiver of the United States land office at Denver, Colo., to enter as a homestead the N. ½ of the N. E. ¼, and the N. E. ¼, of section 23, township 4 S., range 68 W., and was allowed to do so; his application being in due form, and the applicant himself duly qualified to make the application. Having made his application, he entered on the land and resided thereon until about September 1, 1874, when he relinquished the possession to the Kansas Pacific Railway Company, which claimed the land as a part of its land grant. On December 11, 1879, the land was patented by the United States to the last-named railway company, as belonging to it under the act and the amendments thereof which granted to it certain lands in aid of the construction of its railroad. 12 Stat. 489; 13 Stat. 356; 14 Stat. 79. Under the provisions of the aforesaid act and its amendments, as subsequently construed in Railway Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566, the land in controversy did not pass to the railway company as a part of its grant, and should not have been patented to it, because when it filed its map of definite location with the secretary of the interior on May 9, 1870, certain parties, to wit, Sylvester Markwell and A. Hopkins, had, respectively, on November 13, 1865, and April 11, 1866, filed pre-emption claims to the land which prevented the railroad grant from attaching thereto, within the rule announced in the Dunmeyer Case. The complainants remained ignorant of the homestead entry that had been made by their ancestor on the land in controversy until on or about August 11, 1891; but after discovering the entry that had been so made, and the facts in relation thereto, they made an application to the register of the United States land office at Denver. Colo., under the provisions of section 2 of the act of June 15, 1880 (21 Stat. 237, 238), to perfect their title and obtain a patent therefor, and at the time of such application made a tender to the United States of the price of the land, at the rate of $1.25 per acre. The bill further alleged that the Kansas Pacific Railway Company conveyed the land in controversy to the appellees Samuel G. Collins and Sewell T. Collins as early as March 6, 1876, before the receipt of a patent; that the grantees in such conveyance well knew that the railway

company had no title to the land, and that James Wagstaff had made a homestead entry thereon, but that, notwithstanding such knowledge, they had taken possession thereof, and still held it, and had mortgaged a part of the tract to secure a promissory note in the sum of $30,000, which mortgage was made on July 30, 1890. The bill appears to have been filed originally on January 6, 1892, and to have been amended on June 12, 1896. The amended bill prayed that the defendants below be adjudged to hold the legal title to the land in trust for the complainants, and that they be required to convey it to them by a good and sufficient deed of conveyance.

H. E. Luthe and John P. Brockway, for appellants.

Willard Teller (H. M. Orahood, on the brief), for appellees.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court. In view of the averments of the amended bill of complaint, it must be assumed that the land in controversy was properly patented to the Kansas Pacific Railway Company under the rule which prevailed in the land department, and in accordance with which it acted in construing all grants in favor of railroad companies until the promulgation, on March 2, 1885, of the decision in Railway Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566. Prior to the last-mentioned date, the doctrine prevailed that the existence of a pre-emption claim against a tract of land at the time a railroad grant attached thereto did not defeat the grant, if for any reason the pre-emption claim was abandoned or not consummated, but that, upon the failure of the pre-emption claimant to perfect his claim, the land covered thereby inured to the grant as of the date when it became effective. U. S. v. Winona & St. P. R. Co., 165 U. S. 463, 473, 17 Sup. Ct. 368. The inference is plain that as the law was understood and enforced by the land department on December 11, 1879, when a patent for the land in controversy was granted to the Kansas Pacific Railway Company, neither the pre-emption claim in favor of Sylvester Markwell, nor the subsequent one in favor of A. Hopkins, stood in the way of a valid grant to the railway company. At that time these pre-emption claims had doubtless been abandoned by the respective pre-emption claimants, and that fact was established evidently to the satisfaction of the proper officers of the land department, so that, within the law as then construed by the executive branch of the government, the railroad grant became attached to the land at least as early as May 9, 1870, when the map of definite location was filed, and the railway company was entitled to a patent. The same view of the law which actuated the executive branch of the government in granting a patent to the railway company for the land in controversy doubtless induced Samuel G. Collins and Sewell T. Collins, the appellees, to purchase the land from the railway company on March 6, 1876, and it is fair to infer from the allegations of the bill that the same view of the law also influenced James Wagstaff, the complainants' ancestor, to abandon his homestead entry, and submit to the title of the railway company, when it was asserted against him. The bill alleges that the complainants' ancestor was wrongfully and unlawfully ousted from the possession of the land on or about September 1, 1874, but it is not averred that force was employed to

effect the ouster, or that he then claimed that the ouster was wrongful, or that he resorted to legal proceedings of any sort to retain or recover the possession, and, as there are no such averments, it must be presumed that he, in common with the officers of the land department, believed that the railway company's title was paramount, and that he relinquished his claim without contest, on the strength of that belief. Besides, the bill contains allegations to the effect that the complainants' ancestor was in a poor financial condition when the ouster took place; that he was illiterate and ignorant; and that his rights as a settler upon the public domain were not well understood,—from all of which it is evident that in relinquishing his claim the complainants' ancestor did not act involuntarily, in the sense that he was constrained by superior force, or by legal process, but that he acted voluntarily, under a mistaken view of the law.

The settlement of the controversy which this record discloses depends apparently upon the construction and effect of the act of March 3, 1887 (24 Stat. 556, c. 376), and the act of March 2, 1896 (29 Stat. 49, c. 39). The first of these acts is entitled "An act to provide for the adjustment of land grants made by congress to aid in the construction of railroads, and for the forfeiture of unearned lands, and for other purposes," and it was passed for the express purpose of quieting the title to much land lying within the limits of certain railroad land grants that had been clouded by the decision in the Dunmeyer Case, to the effect that the filing of a homestead or preemption claim to a tract of land situated within the limits of a railroad land grant, at any time before the company filed its map of definite location in the general land office, withdrew such tract of land from the operation of the grant, although the claim was not prosecuted and was subsequently abandoned. The first section of that act made it the duty of the secretary of the interior to adjust, in accordance with the decisions of the supreme court, the various land grants theretofore made in aid of the construction of railroads. The second section provided, in substance, that the secretary of the interior should demand a relinquishment or reconveyance to the United States of any lands theretofore granted to any railroad company in aid of the construction of its road, which for any cause had been erroneously certified or patented by the United States as a part of its grant, and that the attorney general should bring suits, if necessary, to cancel such patents and certifications. The remaining sections of the act contained provisions that were designed to protect homestead and pre-emption claimants whose entries had been erroneously canceled by the land department on account of any land grant, and also to protect persons who had purchased lands in good faith from any land-grant company. These sections, so far as it is deemed necessary to quote them in full, are as follows:

"Sec. 3. That if, in the adjustment of said grants, it shall appear that the homestead or pre-emption entry of any bona fide settler has been erroneously cancelled on account of any railroad grant or the withdrawal of public lands from market, such settler upon application shall be reinstated in all his rights and allowed to perfect his entry by complying with the public land laws: provided, that he has not located another claim or made an entry in lieu of the one so erroneously cancelled: and provided also, that he did not volun-

tarily abandon said original entry: and provided further, that if any of said settlers do not renew their application to be reinstated within a reasonable time, to be fixed by the secretary of the interior, then all such unclaimed lands shall be disposed of under the public land laws, with priority of right given to bona fide purchasers of said unclaimed lands, if any, and if there be no such purchasers, then to bona fide settlers residing thereon.

"Sec. 4. That as to all lands, except those mentioned in the foregoing section, which have been so erroneously certified or patented as aforesaid, and which have been sold by the grantee company to citizens of the United States, or to persons who have declared their intention to become such citizens, the person or persons so purchasing in good faith, his heirs or assigns, shall be entitled to the land so purchased, upon making proof of the fact of such purchase at the proper land office within such time and under such rules as may be prescribed by the secretary of the interior, after the grants respectively shall have been adjusted; and patents of the United States shall issue therefor, and shall relate back to the date of the original certification or patenting, and the secretary of the interior, on behalf of the United States, shall demand payment from the company which has so disposed of such lands of an amount equal to the government price of similar lands; and in case of neglect or refusal of such company to make payment as hereafter specified within ninety days after the demand shall have been made, the attorney general shall cause suit or suits to be brought against such company for the said amount. * * *

"Sec. 5. That where any said company shall have sold to citizens of the United States, or to persons who have declared their intention to become such citizens, as a part of its grant, lands not conveyed to or for the use of such company, said lands being the numbered sections prescribed in the grant, and being coterminous with the constructed parts of said road, and where the lands so sold are for any reason excepted from the operation of the grant to said company, it shall be lawful for the bona fide purchaser thereof from said company to make payments to the United States for said lands at the ordinary government price for like lands, and thereupon patents shall issue therefor to the said bona fide purchaser, his heirs or assigns; provided, that all lands shall be excepted from the provisions of this section which at the date of such sales were in the bona fide occupation of adverse claimants under the preemption or homestead laws of the United States, and whose claims and occupation have not since been voluntarily abandoned, as to which excepted lands the said pre-emption and homestead claimants shall be permitted to perfect their proofs and entries and receive patents therefor. * * *"

The provisions last aforesaid, which were inserted in the act of March 3, 1887, for the protection of persons who had purchased lands from a railroad company in the belief that the land so acquired fell within the terms of its grant, were further reinforced by a clause which was inserted in a subsequent act, approved on March 2, 1896 (29 Stat. 42, c. 39). This latter act fixed a period within which suits should be brought by the United States to cancel patents that had been erroneously issued under railroad land grants, and in the first section thereof is found the following provision: "But no patent to any lands held by a bona fide purchaser shall be vacated or annulled but the right and title of such purchaser is hereby confirmed. * * *"

The two acts of congress to which reference has been made underwent careful analysis in the recent case of U. S. v. Winona & St. P. R. Co., 165 U. S. 463, 481, 17 Sup. Ct. 368, and the judgment of the court concerning the effect of those acts upon the rights of one who had acquired land by purchase from a railroad company, the title to which had been invalidated by the decision in the Dunmeyer Case, was stated in the following language:

"Our conclusion is that these acts operate to confirm the title to every purchaser from a railroad company of lands certified or patented to or for its

benefit, notwithstanding any mere errors or irregularities in the proceedings of the land department, and notwithstanding the fact that the lands so certified or patented were, by the true construction of the land grants, although within the limits of the grants, excepted from their operation, providing that he purchased in good faith, paid value for the lands, and providing also that the lands were 'public lands,' in the statutory sense of the term, and free from individual or other claims."

The court also held in that case, in substance, that the words "bona fide purchaser," as employed in the acts of March 3, 1887, and March 2, 1896, referred to above, were not used by congress in any technical sense, but were intended to comprehend all persons who had bought land from a railroad company and paid value therefor, acting at the time under an honest belief that they were acquiring a good title; and that such persons were none the less bona fide purchasers, within the meaning of the acts, although they did have knowledge of facts which, but for a mistaken view of the law, would have demonstrated that the vendor company had no title.

The fifth section of the act of March 3, 1887, to say nothing of the act of March 2, 1896, covers the case at bar in all of its essential features, and in terms entitles the appellees to a confirmation of their title. The appellees Samuel G. Collins and Sewell T. Collins received a conveyance of the land in controversy from the Kansas Pacific Railway Company prior to the issuance of a patent to that company, and the land appears to have been the numbered sections prescribed in its grant, and to have been coterminous with the constructed parts of its road. At the time the appellees so acquired the land it was not occupied by adverse claimants under the pre-emption or homestead laws; for, as the bill discloses, the complainants' ancestor had relinquished the possession thereof a year and a half previously under circumstances which must be regarded as voluntary, inasmuch as such relinquishment is not shown to have been in a legal sense involuntary. Moreover, there are no allegations in the bill which will serve to impugn the good faith of the purchasers from the railway company, since they acted in the pursuance of a belief which was then prevalent that the railway company had a perfect title, under the terms of its grant.

It is urged, however, in opposition to this view, that the complainants' ancestor had acquired a vested right in the land by virtue of his homestead claim and residence thereon, of which neither he nor his heirs could be deprived by subsequent legislation, and that the complainants are therefore entitled to the land, to the exclusion of the purchasers from the railway company, although congress clearly intended to confirm the purchasers' title. We are not able to assent to this proposition. In the case of Shiver v. U. S., 159 U. S. 491, 495, 16 Sup. Ct. 54, the doctrine was fully approved that an entry upon public land accompanied by residence thereon, in pursuance of such permission as is given by the land laws of the United States, confers no vested interest in the land until the settler has remained in possession for the length of time or done the acts which under the law entitled him to a patent. Such a settlement, it was said, protects the settler from intrusion by others, but confers no rights as against the United States. This court in Norton v. Evans, 49 U. S. App. 669, 27 C. C. A. 168, and 82 Fed. 804, 807, also applied the same rule, that

had long been applied to pre-emption claimants, to a homestead claimant, holding that an entry by the latter "creates no vested rights as against the United States, and does not interfere with the power of congress by subsequent legislation to dispose of the land"; citing Frisbie v. Whitney, 9 Wall. 187; The Yosemite Valley Case, 15 Wall. 77; Buxton v. Traver, 130 U. S. 232, 9 Sup. Ct. 509; Campbell v. Wade, 132 U. S. 34, 10 Sup. Ct. 9. We think, therefore, that such entry as was alleged to have been made by James Wagstaff, the complainants' ancestor, in December, 1871, and to have been relinquished by him in September, 1874, without contest, and apparently before his entry had been canceled by the officers of the land department, cannot be regarded as creating a vested right in the land which congress was without power to destroy. We think that it was within the power of the legislative branch of the government to confirm the title of the purchasers from the railway company to the land in controversy, and that the act of March 3, 1887, was adequate to accomplish that object. The judgment of the circuit court, dismissing the bill of complaint, is therefore affirmed.